## AFFIDAVIT OF VINCENT CHAMBERS

I, Vincent Chambers, being duly sworn, depose and state as follows:

1. I am a Special Agent of the Federal Bureau of Investigation ("FBI") assigned to the investigation of Drug Trafficking Organizations, and have been employed by the FBI for approximately two years. My training includes attending the 18-week FBI basic agent training at the FBI Academy, Quantico, Virginia in 2004-2005. I am a currently assigned to the Drug Squad, Boston FBI. My responsibilities include the investigation of crimes involving drug trafficking and drug trafficking organizations.

2. Based on my training and experience, I am aware that it is a violation of Title 21, United States Code, Sections 846 and 841(a)(1) for individuals to conspire to distribute cocaine. I submit this affidavit in support of a criminal complaint charging Umberto MEDRANO, Luis VIZCARRA, Jorge TIRADO, Alejandro RODRIGUEZ, and Alejandro GARCILIA with conspiracy to distribute cocaine, in violation of Title 21, United States Code, Section 846 and 841(a)(1).

3. The statements contained in this affidavit are based on my participation in the investigation of the criminal activity described herein, as well as information provided to me by other federal agents involved in this investigation, as well as my

experience, training, and background as a Special Agent with the FBI. This affidavit does not discuss all of the evidence obtained during the investigation, but only that which I believe is necessary to establish probable cause.

   4. In July of 2005, Special Agent William White of the Federal Bureau of Investigation received a call from an individual who was interested in cooperating with the FBI in the investigation of a Drug Trafficking Organization ("DTO"). According to this individual ("CW"), prior to his cooperation in this investigation, he was involved in three separate deliveries of cocaine from California to Massachusetts and Rhode Island. On one occasion he drove a load of cocaine from California to Rhode Island. As part of the same transaction, CW drove a large amount of cash from Massachusetts back to California. In addition, on two occasions CW took delivery of packages of cocaine shipped via UPS and Federal Express. These transactions are detailed more fully below. In return for his cooperation with the FBI, CW is hoping to receive consideration on several pending criminal matters, including charges of larceny by check, credit card fraud, and restraining order violations. In addition, CW is being compensated by the FBI for his cooperation.

   5. According to CW, Umberto MEDRANO ("MEDRANO") is the leader of this DTO and smuggles cocaine from Mexico to Luis VIZCARRA ("VIZCARRA") in California. VIZCARRA is a high ranking member of the DTO who resides in California. VIZCARRA takes

shipment of the cocaine from MEDRANO and distributes it, via couriers, to Jorge TIRADO ("TIRADO"), who is responsible for distributing the cocaine in Massachusetts. TIRADO resides at 102 Chester Street, Allston, Massachusetts. CW was introduced to the organization by a friend, Carlos NAVARRO, whom he has known for a few years. According to CW, NAVARRO began the Massachusetts operation by introducing VIZCARRA to TIRADO. At some point in time, CW was asked by TIRADO to participate in the DTO by transporting cocaine from California to Rhode Island. CW agreed. CW's first assignment was to transport a quantity of cocaine from California to Rhode Island.

6. In or about July or August, 2004, CW received an instant message at his hotmail account from a member of the DTO. The message instructed CW to fly to Salt Lake City, Utah, and rent either a 2003 or 2004 Ford Focus. CW complied with these instructions and then drove to VIZCARRA's residence in Chino Hills, California. When CW arrived at VIZCARRA's residence, the Ford Focus was parked inside VIZCARRA's garage. CW, VIZCARRA, and MEDRANO then removed the car's rear bumper, installed a secret compartment within the bumper, and placed approximately twenty kilograms of cocaine inside the compartment. VIZCARRA then directed CW to drive the car back to Providence, Rhode

Island.

7. Upon his arrival in Rhode Island, CW parked the Ford Focus in a friend's garage. Pursuant to instructions from VIZCARRA, CW then picked up VIZCARRA and MEDRANO at Logan International Airport in Boston. CW drove them to the garage in Providence, where CW, VIZCARRA, and MEDRANO removed the cocaine from the hidden compartment. According to CW, other members of the DTO packaged the cocaine into gym bags and then transported the cocaine to TIRADO's apartment at 102 Chester Street, Allston, Massachusetts.

8. A few days later, CW was directed to a house at 18 Sheriden Street in Jamaica Plain. There, CW observed VIZCARRA and other members of the DTO place approximately $600,000 into the hidden compartment in the Ford Focus. Pursuant to instructions from VIZCARRA, CW then transported the $600,000 to VIZCARRA'S residence in California, where VIZCARRA paid CW $8,000 for his work.

9. In or about May 2005, the CW was asked to take delivery of two packages of cocaine that were to be sent by mail. Around the same time, an individual using the name Roman Diaz e-mailed the shipping information for the two packages to TIRADO at TIRADO's hotmail account, tiraido98@hotmail.com. TIRADO then

forwarded the e-mail to the CW at his Hotmail account on May 5, 2005. The e-mail contained a Federal Express shipping number and a United Parcel Service ("UPS") shipping number. CW has provided the FBI with a hard copy of these e-mails and an FBI agent has confirmed this information contained within the e-mails. Within a few days of receiving this e-mail, CW received a Federal Express package at his residence. The package contained one or two kilograms of cocaine. The CW then delivered the package to TIRADO. A few days later, a neighbor of the CW's brought him the second package, which UPS had inadvertently delivered to the neighbor's house. This package contained ten kilograms of cocaine. The CW then delivered the package to TIRADO at 102 Chester Street, Allston, Massachusetts. In exchange, the CW was to be paid $500.

10. Since providing the information detailed above, CW agreed to make another delivery of cocaine for the DTO under the supervision of FBI and task force agents. According to CW, sometime in June 2005, when CW was living and working in Rhode Island, TIRADO sent him an email soliciting his help in transporting another shipment of cocaine from California to Massachusetts and money from Massachusetts back to California. According to CW, TIRADO sent the e-mail from his Hotmail account

to CW at his Hotmail account. Sometime after agreeing to do the deal with TIRADO, CW moved in with TIRADO at 102 Chester Street, Allston, Massachusetts, for the purpose of making himself more readily available to TIRADO and VIZCARRA. On or about August 17, 2005, TIRADO notified CW that the he was to travel to California on the following morning, August 18, 2005. At the time, it was CW's understanding that VIZCARRA now lived in San Diego, California. CW then notified me. I, in turn, notified other FBI and task force agents, and then notified San Diego FBI agents.

11. On August 18, 2005, I accompanied CW on his flight to San Diego. Upon arriving in San Diego, CW was equipped with a recording device. CW was picked up at the airport by VIZCARRA and an individual later identified by CW as Alejandro GARCILIA. I, along with other agents, surveilled VIZCARRA, GARCILIA and CW to VIZCARRA's residence at 955 Camiito Estrella, Chula Vista, California, where CW stayed with VIZCARRA and GARCILIA until CW departed for Massachusetts on August 21, 2005. According to CW, while he was staying at VIZCARRA's residence, CW was directed by VIZCARRA to go to the registry of motor vehicles ("RMV") and register a white Ford Focus under his own name, which was to be used as the transport vehicle. CW, accompanied by GARCILIA, drove the white Ford Focus to the RMV and registered the car in his own name. Agents picked up surveillance of CW at the RMV,

6

where they observed CW drive into the parking lot in the white Ford Focus with another male seated in the front passenger seat.

12.   While staying at VIZCARRA's residence, CW continued to wear the electronic recording device and made occasional phone calls to agents to provide updates on his and VIZCARRA's activities.

13.   According to CW, on one of the nights he was staying at VIZCARRA's residence, CW used cocaine with VIZCARRA and GARCILIA. CW stated that he believed it would have looked suspicious if he refused the offer to use cocaine.

14.   According to CW, on the afternoon of August 21, 2005, VIZCARRA removed three kilograms of cocaine from the cabinets under a sink in the master bedroom and VIZCARRA, GARCILIA and CW packaged the three kilograms of cocaine into a secret compartment hidden under the rear bumper of the white Ford Focus. VIZCARRA at some point had told CW that the three kilograms would be a "test run," and if it went smoothly there would be bigger deliveries in the future. VIZCARRA, GARCILIA and CW then went to lunch, driving in VIZCARRA's pick-up truck. After returning from lunch, CW departed VIZCARRA's residence alone in the Ford Focus. I, along with other agents, made contact with CW shortly after he departed the VIZCARRA residence. CW was led to the FBI office in San Diego, where agents successfully opened a secret compartment

located under the rear bumper of the Ford Focus. Inside, agents located three individual heat-sealed packages of cocaine, each weighing approximately one kilogram. Each package was brick-shaped, with the brick of cocaine being wrapped in cellophane and placed inside a heat sealed bag. Agents also removed registration documents from the car, which listed the seller of the car as Umberto MEDRANO of Automotriz Mazatlan, Tijuana, Mexico.

    15. CW was directed by agents to travel to Massachusetts where he was to meet up with agents again. It was the agents' plan to have CW deliver money instead of the cocaine, and to have CW tell TIRADO that he (CW) found his own buyer to sell the three kilograms to. As CW traveled to Massachusetts, he maintained telephone contact with agents. On August 26, 2005, CW arrived in Massachusetts and met with agents at the FBI office in Boston. While at the FBI office, CW received phone calls from both TIRADO and VIZCARRA. Both calls were recorded. During these conversations, both VIZCARRA and TIRADO told CW to deliver the cocaine to TIRADO and not to sell the cocaine on his own. Apparently both VIZCARRA and TIRADO were concerned that CW might try to sell the cocaine on his own based on previous statements he had made, including a statement to VIZCARRA that he (CW) was interested in playing a bigger role in the organization and making more money. During the conversation with TIRADO, CW told

TIRADO that he was currently in Albany, New York and would arrive in approximately four hours. At this meeting, CW was provided with $66,000 in marked U.S. currency and was instructed to deliver the money to TIRADO as payment for the cocaine. CW was equipped with an electronic recording and transmitting device and proceeded to TIRADO's apartment at 102 Chester Street, Second Floor, Allston, Massachusetts.

16. Agents followed CW to 102 Chester Street, where CW met with TIRADO and an individual named Alejandro RODRIGUEZ, a/k/a "Flaco." According to CW, he was familiar with RODRIGUEZ and knew him to be an associate of TIRADO and VIZCARRA. According to CW, RODRIGUEZ was indebted to VIZCARRA because on a prior occasion RODRIGUEZ had lost ten kilograms of VIZCARRA's cocaine, valued at approximately $200,000. After the meeting with TIRADO, CW was debriefed. According to CW, TIRADO and VIZCARRA were angered by the fact that CW showed up with money instead of the cocaine. After calming down, TIRADO and RODRIGUEZ counted the money along with CW and appeared satisfied with the amount of money. RODRIGUEZ then took the money and placed it into a safe in his bedroom. During the meeting, agents monitoring the listening device could hear conversation which was consistent with CW's description of events.

17. Prior to making the return trip to California with the money, CW was informed by TIRADO that VIZCARRA wanted RODRIGUEZ

9

to accompany CW back to California. CW and RODRIGUEZ were to deliver $60,000 to VIZCARRA as payment for the three kilograms, and then were to make another delivery of cocaine from VIZCARRA to TIRADO. On September 2, 2005, agents conducting surveillance observed CW and RODRIGUEZ package $60,000 of the marked currency into the secret hide under the rear bumper of the Ford Focus. The next day, September 3, 2005, CW and RODRIGUEZ departed for California in the Ford Focus. In the early morning of September 6, 2005 CW and RODRIGUEZ arrived in San Diego and spent the night at a local hotel. Upon their arrival, CW contacted a Boston task force agent, who was already in San Diego, to let him know that he had arrived. The next day, VIZCARRA and GARCILIA met with CW and RODRIGUEZ. Later that day, while under surveillance, they returned to VIZCARRA's residence and the Ford Focus was initially parked in the street in front of the residence. The CW later backed the Ford Focus into the garage and the garage door was shut. According to CW, who is currently staying in VIZCARRA's residence and providing occasional updates to agents via telephone calls, the money was then unloaded. CW removed the rear bumper and RODRIGUEZ unloaded the money into a bag being held by GARCILIA. GARCILIA then took the money and said he was bringing it upstairs to VIZCARRA. A short time later, VIZCARRA told CW, RODRIGUEZ and GARCILIA to leave the residence for about an hour.

18. As noted above, CW is currently staying at VIZCARRA's. CW has informed agents that VIZCARRA has stated that MEDRANO would be arriving sometime on Sunday, September 11, 2005. VIZCARRA has also told CW that he (CW) would be leaving with ten kilograms of cocaine on Monday, September 12, 2005. Based on this information, CW believes MEDRANO will be delivering the ten kilograms of cocaine to VIZCARRA's house.

19. Based upon the information above, I have probable cause to believe that Umberto MEDRANO, Luis VIZCARRA, Jorge TIRADO, Alejandro RODRIGUEZ, Alejandro GARCILIA, and others, have conspired to distribute cocaine, in violation of Title 21, United States Code, Sections 846 and 841(a)(1).

_S. Vincent M. Chambers_
Vincent Chambers
Special Agent
Federal Bureau of
Investigation

Sworn and subscribed to me this eleventh day of September, 2005.   at 5:58 pm

ROBERT B. COLLINGS
UNITED STATES MAGISTRATE JUDGE

11